# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **B&P GLASS AND MIRROR, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:22-cv-00772** |
| **CLOZETIVITY FRANCHISING, LLC,** | ) | **Judge Aleta A. Trauger** |
| **LEIBY GOLDBERGER, and CURT** | ) | |
| **SWANSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Defendants Clozetivity Franchising, LLC ("Clozetivity"), Leiby Goldberger, and Curt Swanson have filed a Motion to Dismiss and Compel Arbitration or, In the Alternative, Motion to Join an Indispensable Party (Doc. No. 13), to which B&P Glass and Mirror, LLC ("B&P") has filed a Response (Doc. No. 22), and the defendants have filed a Reply (Doc. No. 24). For the reasons set out herein, the motion will be granted in part and denied in part.

## <u>I. BACKGROUND</u>[1]

When a party "owns" a trademark, that does not mean that the party has a property interest in the creative aspects of the words or visual elements that make up the mark. Rights like those—that is, creative rights—are covered by copyright, not trademark. Trademark law is concerned, instead, with the commercial goodwill that the mark embodies based on its association with a particular furnisher of goods or services. "Under traditional principles of trademark law, '[t]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.'" *Yellowbook*

---

[1] Unless otherwise indicated, the facts herein are taken from the Complaint (Doc. No. 1) and are accepted as true for the purposes of the pending motion.

*Inc. v. Brandeberry*, 708 F.3d 837, 844 (6th Cir. 2013) (quoting *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir.1998); citing Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L.J. 1687, 1688 (1999)). The commercial value of a trademark—or a cluster of trademarks fashioned into a brand identity—rests primarily in the mark's ability to convey to consumers that the good or service being offered is the product of an actual, existing business toward which consumers have, or could develop, some degree of goodwill.

Making money off of an existing trademark is therefore not as simple as just selling rights to use the mark to the highest bidder, like a musical composition or piece of copyright-protected software. Indeed, that is not even an option, because "[a]ssignment of a trademark without its associated goodwill is treated as an invalid 'assignment in gross' that gives the assignee no rights." *Id.* (citing 15 U.S.C. § 1060; *In re Roman Cleanser Co.*, 802 F.2d 207, 208 (6th Cir. 1986); *Greenlon Inc. of Cincinnati v. Greenlawn, Inc.*, 542 F. Supp. 890, 893 (S.D. Ohio 1982)). Rather, a party that wishes to increase the amount of money it is making off of a trademark has, broadly speaking, three options: it can expand or otherwise improve the existing business with which the trademark is associated, thereby increasing the goodwill embodied by the mark; it can liquidate that goodwill by selling the entire business, trademarks and all, to a buyer; or it can retain ownership of the mark but license limited usage rights to third parties who are contractually bound to honor certain quality-control obligations that would prevent the license from being struck down as an invalid assignment in gross. That third strategy—licensing—can take many forms, one of which is "franchising," the licensing of a brand identity to individual operators to carry out the licensor's preexisting business model as formally distinct,

2

but contractually linked, franchisees. Franchising is common, and many well-known brands are, in fact, not unitary enterprises, but wide-reaching franchise operations.

Franchising, like many industries, provides opportunities for bad actors to take advantage of unsophisticated counterparties—for example, by luring prospective franchisees into paying exorbitant fees to open franchises with little or no chance of actual success. In light of those risks, "[o]n November 11, 1971, the [Federal Trade Commission ('FTC')] announced the initiation of a proceeding for the promulgation of a trade regulation rule relating to disclosure requirements and prohibitions concerning franchising," which ultimately culminated in the final issuance of that agency's "Franchise Rule" several years later. 43 Fed. Reg. 59614, at 59,622. The Franchise Rule "requires franchisors to furnish prospective franchisees with disclosure documents"—commonly known as the company's "FDD"—"at least 14 calendar days before the prospective franchisee signs the franchise agreement." *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 835 (5th Cir. 2021) (citing 16 C.F.R. § 436.2(a)). An FDD must contain certain required information about the franchisor and the business being franchised, *see* 16 C.F.R. § 436.5, and "[a]ll information in the disclosure document" must "be current as of the close of the franchisor's most recent fiscal year." 16 C.F.R. § 436.7(a).

Clozetivity is a franchisor whose franchisees "provide[] customized closet and storage solutions." (Doc. No. 1 ¶¶ 2, 8.) It is organized as a Tennessee limited liability company that, at the time this litigation commenced, had three members: defendant Goldberger, who lives in New Jersey; defendant Swanson, who lives in New York; and nonparty Thomas J. Scott, who lives in Tennessee.[2] (*Id.* ¶¶ 2–4; Doc. No. 15 at 3.) The Franchise Rule's disclosure requirements reach beyond the franchisor itself to "the franchisor's directors, trustees, general partners, principal

---

[2] A falling out between the defendants and Scott appears to have played a significant role in the events surrounding this lawsuit. The court, however, will focus on the claims actually at issue and will touch on any underlying conflicts only to the extent that they are relevant to contested matters in this case.

3

officers, and any other individuals who will have management responsibility relating to the sale or operation of franchises offered." 16 C.F.R. § 436.5. Accordingly, Goldberger, Swanson, and Scott were among the subjects required to be covered by Clozetivity's FDDs.

The Franchise Rule groups the information required in an FDD into categories numbered Item 1 through Item 23. *See* 16 C.F.R. § 436.5(a)–(w). Item 3 requires the disclosure of certain information regarding the litigation history of the franchisor and covered individuals. *See* 16 C.F.R. § 436.5(c). Goldberger and Swanson were previously involved with another franchisor, Patch Boys Franchising, LLC ("Patch Boys"), which was the subject of two now-concluded lawsuits in the District of Minnesota, an investigation by the Minnesota Department of Commerce, and an investigation by the Attorney General of New York. (Doc. No. 1 ¶¶ 17–22, 26, 28.) The Minnesota Department of Commerce investigation resulted in a Consent Order "whereby Patch Boys and Goldberger acknowledged that they violated the Minnesota Franchise Act" and "agreed to pay a civil penalty in the amount of $7,500, agreed to refrain from violating any laws, rule or orders in Minnesota, including the Minnesota Franchise Act, and [agreed not to] sell franchises in Minnesota until the Patch Boys' FDD was registered." (*Id.* ¶ 26.) The New York investigation resulted in an "Assurance [of] Discontinuance Pursuant to [N.Y.] Executive Law § 63(12) . . . , wherein Patch Boys and Goldberger acknowledged that they sold franchises without disclosing Goldberger's 1999 felony conviction [for credit card fraud] in Patch Boys' FDD, as required by New York law, and agreed to pay a $10,000 fine." (*Id.* ¶ 28.) The Complaint and supporting materials provide less detail about the conclusion of the two private Minnesota lawsuits, but they confirm that Goldberger and Swanson were named defendants in both. (*Id.* ¶¶ 17, 20.) The Complaint asserts that details of all of those matters—as well as an

4

additional lawsuit against Goldberger involving bad checks—were wrongfully omitted from Clozetivity's standard FDD. (*Id.* ¶¶ 30–39.)

B&P is a Kentucky-based limited liability company that entered into a franchise agreement with Clozetivity in reliance on the allegedly deficient FDD. (*Id.* ¶¶ 1, 29, 50.) On October 2, 2022, B&P filed a Complaint in this court, asserting claims against Clozetivity, Goldberger, and Swanson. (Doc. No. 1.) The Complaint purports to assert three counts. Counts One and Two are each for fraudulent inducement to contract, with Count One focusing on affirmative misrepresentations and Count Two focusing on fraudulent concealment. (*Id.* ¶¶ 57–69.) The Complaint characterizes Count Three as a claim for "injunctive relief," which is a remedy, not a cause of action. *See Goryoka v. Quicken Loan, Inc.*, 519 F. App'x 926, 929 (6th Cir. 2013). One of the paragraphs in Count III, however, describes the request as "pursuant to" a section of the Tennessee Consumer Protection Act, so the court will construe Count III as asserting a claim pursuant to that statute. (*Id.* ¶¶ 70–74.)

On November 18, 2022, the defendants filed a Motion (Doc. No. 13), requesting that the court compel B&P to submit its claims to arbitration pursuant to the parties' franchise agreement, which included the following provision:

**17.1 Arbitration.**

(a) <u>Disputes Subject to Arbitration</u>. Except as expressly provided in subsection (c), any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

(b) <u>Location</u>. The place of arbitration shall be the city and state where CLOZETIVITY FRANCHISING® headquarters are located.

(c) <u>Injunctive Relief</u>. Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy or right to arbitrate under this Agreement, seek from any court having jurisdiction any interim or provisional injunctive relief, pending the arbitral tribunal's determination of the merits of the controversy.

(Doc. No. 1-2 at 26–27.) In the alternative, the defendants ask the court to require B&P to add Scott as an indispensable party, in accordance with Rule 19 of the Federal Rules of Civil Procedure. (Doc. No. 13 at 1.)

## II. LEGAL STANDARD

The question of whether the plaintiff's claims must be arbitrated is governed by the Federal Arbitration Act ("FAA"). The FAA provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a "strong presumption" in favor of arbitration under the FAA. *Huffman v. Hilltop Companies, LLC*, 747 F.3d 391, 393 (6th Cir. 2014). "[A]ny doubts regarding arbitrability should be resolved in favor of arbitration." *Fazio v. Lehman Bros.*, 340 F.3d 386, 392 (6th Cir. 2003) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). Where a litigant establishes the existence of a valid agreement to arbitrate the dispute at issue, the court must grant the litigant's motion to compel arbitration and stay or dismiss proceedings until the completion of arbitration. *Glazer v. Lehman Bros., Inc.*, (citing 9 U.S.C. §§ 3–4). The party opposing arbitration has the burden to prove that there is a "genuine issue of material fact as to the validity of the agreement to arbitrate." *Brubaker v. Barrett*, 801 F. Supp. 2d 743, 750 (E.D. Tenn. 2011) (quoting *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)).

6

## III. ANALYSIS

B&P, relying on citations to some older state cases, argues that its claims are not subject to arbitration because Tennessee law categorically prohibits the arbitration of fraudulent inducement claims. (Doc. No. 22 at 3–6 (citing *Frizzell Const. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 86 (Tenn. 1999); *Whisenant v. Bill Heard Chevrolet, Inc.*, No. W2004-01745-COA-R3CV, 2005 WL 1629991, at *3–4 (Tenn. Ct. App. July 12, 2005); *City of Blaine v. John Coleman Hayes & Assocs., Inc.*, 818 S.W.2d 33, 38 (Tenn. Ct. App. 1991)).) The defendants dispute that Tennessee law applies in this case, noting that the franchise agreement includes a choice of law provision selecting New Jersey law to govern any litigation between the parties. (Doc. No. 1-2 at 28.) B&P suggests that the agreement mentions New Jersey, rather than Tennessee, due to a clerical error that occurred in Clozetivity's copying provisions from an earlier contract. B&P also argues that, if the court concludes that the provision really was intended to select New Jersey law, then the court should consider that choice of law an impermissible one, due to the lack of a connection between New Jersey and the underlying transaction.

Ultimately, though, there is no need for the court to get into a complex choice of law analysis, because, even if Tennessee law does apply to the parties' relationship as a general matter, it does not govern the question of whether a claim for fraudulent inducement to contract is arbitrable or non-arbitrable. Although there was a time when the caselaw was somewhat unsettled on these issues, it is now well-established that, "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011) (citing *Preston v. Ferrer*, 552 U.S. 346, 353 (2008)). Indeed, the Tennessee Supreme Court itself has

7

now recognized that, "if the parties agreed to arbitrate the claim of fraudulent inducement, then despite such a prohibition under Tennessee law, the claim must be submitted to arbitration." *Taylor v. Butler*, 142 S.W.3d 277, 283 (Tenn. 2004). Although B&P first flatly asserts that "Tennessee law provides that fraudulent inducement claims cannot be arbitrated," it ultimately concedes that "later decisions" have acknowledged that such claims may be arbitrable in at least some situations. (Doc. No. 22 at 5–6.) B&P argues, however, that that is only the case if the agreement at issue specifically cites the FAA, thereby signaling the parties' intent to rely on federal principles of what may be arbitrated. (*Id.*)

B&P's focus on the intent of the parties is well-founded, but its theory of how that intent should be determined is inconsistent with the law. It is true that parties "may limit by contract the issues which they will arbitrate," *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989), and that parties therefore could choose to exclude fraudulent inducement claims from arbitration by, for example, expressly stating that they intend to exclude from arbitration any cause of action that has historically been held to be non-arbitrable under Tennessee state law. In order to set forth a rule like that, however, the parties would have to actually express such an intent—not simply fail to cite the FAA expressly. Indeed, the Supreme Court has specifically rejected the argument that, simply because a contract is governed by the laws of a particular state, the court should construe an arbitration provision in that contract to exclude claims that would be non-arbitrable under the laws of that state, but for the FAA. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60 (1995). The argument for importing older, displaced Tennessee rules based on the expressed intent of the parties is particularly unconvincing in this instance, given that the Tennessee choice of law

provision on which B&P seeks to rely does not actually exist, but is, rather, a creature of pure speculation that the actual contractual terms at issue directly contradict.

There is, moreover, no requirement that a contract invoke the FAA by name in order for the statute to govern. To the contrary, the FAA comes into play any time a party seeking to compel arbitration over the objection of an opposing party establishes "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, [and] (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce." *Parker v. Resurgent Cap. Servs. LP*, No. 4:19-CV-50-BO, 2019 WL 4643745, at *1 (E.D.N.C. Sept. 23, 2019) (citing *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 84 (4th Cir. 2016)). All of those prerequisites exist here, and nothing in the franchise agreement actually reflects a meeting of the minds to exclude fraudulent inducement claims from arbitration. The court, accordingly, will compel arbitration.

The FAA instructs that, "upon being satisfied that the issue involved in [a] suit or proceeding is referable to arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. B&P has made a request that the court stay, rather than dismiss, its claims, and so that is what the court will do. Consistently with the language of the arbitration provision itself, the stay will include an exception for any request for preliminary injunctive relief, should one be made pursuant to a properly supported motion. Because the defendants' request to join Scott was made only in the alternative, the court will deny that aspect of their request without prejudice to the underlying issues being raised at a procedurally appropriate juncture.

9

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss and Compel Arbitration or, In the Alternative, Motion to Join an Indispensable Party (Doc. No. 13) will be granted as to the request to compel arbitration and denied as to the request to join an indispensable party.

An appropriate order will enter.


ALETA A. TRAUGER
United States District Judge